FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS** 2015 JUN 25  AM 9: 29
**AUSTIN DIVISION**

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____

**XITRONIX CORPORATION,**
**Plaintiff,**

-vs-                                                    **Case No.  A-14-CA-1113-SS**

**KLA-TENCOR CORPORATION,**
**Defendant.**

_____

**O R D E R**

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendant KLA-Tencor Corporation's Motion to Dismiss [#5], Plaintiff Xitronix Corporation's Response [#7], and KLA-Tencor Corporation's Reply [#9].  Having reviewed the documents, the relevant law, and the file as a whole, the Court now enters the following opinion and orders DENYING the motion.

**Background**

Reading the allegations in Plaintiff Xitronix Corporation (Xitronix)'s favor, this lawsuit involves Xitronix's attempt to compete in the dopant activation metrology marketplace and Defendant KLA-Tencor Corporation (KLA)'s repeated and sustained attempts to illegally prohibit Xitronix from competing with KLA through the use of patent law.  KLA is the assignee of the following related patents: (1) United States Patent No. 8,817,260 (the '260 Patent); (2) U.S. Patent No. 7,646,486 (the '486 Patent); and (3) United States Patent No. 7,362,441 (the '441 Patent).  The '260 Patent is a continuation of the '486 Patent, which is a continuation of the '441 Patent, which itself was a continuation of an earlier patent, United States Patent No. 7,126,690 (the '690 Patent).

The patented technology involves, in general terms, a system which provides high resolution, non-destructive evaluation of semiconductor wafers as they pass through various semiconductor manufacturing stages. More specifically, the patent claims the parties have disputed deal with the wavelength of the probe beam used in this system. According to Xitronix, KLA prosecuted these patents "with the central aim of capturing Xitronix's technology within the scope of their respective claims." Compl. [#1] ¶ 7.

In the current lawsuit, Xitronix has brought a *Walker Process* antitrust claim against KLA based on KLA's allegedly fraudulent procurement of the '260 Patent, and KLA has filed a motion to dismiss for failure to state a claim upon which relief can be granted. In order to assess whether Xitronix's allegations satisfy Rule 12, the Court must first describe the litigation history between these two parties, as the instant case is the third installment in a trilogy of lawsuits.

## I.    The First Two Lawsuits

First, in September 2008, Xitronix sued KLA, asserting a declaratory judgment of non-infringement with respect to the '441 Patent and its parent, the '690 Patent. *See* Compl. [#1] at 2, *Xitronix Corp. v. KLA-Tencor Corp.*, No. 1:08-CV-723-SS (W.D. Tex. Jan. 31, 2011) (the First Lawsuit). KLA had apparently informed Xitronix through numerous letters of its belief Xitronix was engaged in ongoing infringement of KLA's patents, prompting Xitronix to respond with its non-infringement suit. *Id.* at 4–9. In November 2010, the parties tried the case to a jury, which returned a verdict finding Xitronix had infringed claim 7 of the '441 Patent but had not infringed any other claims. Order of Jan. 31, 2011 [#210] at 1, the First Lawsuit. The jury also found, however, that claim 7 of the '441 Patent was invalid as anticipated by prior art. *Id.* at 1–2. The jury further found all of the asserted claims—claims 7, 9, 11, and 12—of the '441 Patent were invalid due to

-2-

obviousness. *Id.* at 2. Post-trial, the Court ordered the parties to brief whether the claims at issue were also invalid due to indefiniteness, and the Court ultimately held the claims were indefinite. *Id.* at 3, 5–9. Additionally, the Court held there was ample evidence to support the jury's verdict of invalidity based on anticipation and obviousness. *Id.* at 10–12. KLA did not appeal the case.

Second, in March 2011, Xitronix filed a lawsuit against KLA in Texas state court, alleging state law causes of action for business disparagement, tortious interference, and unlawful restraint of trade, which was subsequently removed by KLA to this Court. *See* Notice Removal [#1], *Xitronix Corporation v. KLA-Tencor Corporation*, No. 1:11-CV-358-SS (W.D. Tex. July 7, 2011) (the Second Lawsuit). Xitronix's state law claims were based on KLA's conduct in and surrounding the First Lawsuit, including: "(1) KLA's alleged knowing false statements of infringement of the '411 Patent by Xitronix; and (2) KLA's alleged bad faith use of litigation to impair Xitronix's business operations." Order of July 7, 2011 [#16] at 2, the Second Lawsuit. Xitronix moved to remand, and the Court granted the motion because the only substantial question of patent law (which supposedly provided the basis for removal) was already decided in the First Lawsuit. *Id.* On remand, the state court, according to Xitronix's allegations, granted summary judgment in favor of KLA for unspecified reasons, and on appeal, the Third District Court of Appeals of Austin affirmed the summary judgment on res judicata grounds, holding Xitronix's antitrust claims arose out of the same nucleus of operative facts underlying its claims in the First Lawsuit. Compl. [#1] ¶ 34. Xitronix has a petition for review of that decision pending before the Supreme Court of Texas. *Id.*

## II.    The Current Lawsuit

As previously stated, Xitronix has now filed a third lawsuit, asserting a *Walker Process* antitrust claim based on KLA's alleged fraudulent procurement of the '260 Patent. KLA obtained

the '260 Patent over a period of years involving back-and-forth exchanges with the PTO. KLA filed

its patent application for the '260 Patent on November 11, 2009, and on February 2, 2011, just two

days after the Court's entry of the final judgment in the First Lawsuit, the PTO examiner allowed

KLA's pending claims in the '260 Patent, claims which Xitronix contends are essentially identical

to the invalidated patent claims of the '441 Patent. Compl. [#1] ¶ 28. On February 10, 2011, KLA's

patent prosecution attorney, Michael Stallman, submitted a request for a continued examination of

the '260 Patent, and he concurrently submitted an information disclosure statement listing an

"Executed ORDER from the United States District Court for the Western District of Texas, Austin

Division, Case no. A-08-CA-723-SS, dated January 31, 2011, 13 pages in length." *Id.* ¶ 29.

Xitronix, however, alleges Stallman did not explain to the patent examiner how this Court's January

31, 2011 Order related to the then-pending '260 Patent; how the pending claims were identical to,

or broadened from, claims in the '441 Patent held in valid as a final judgment in the First Lawsuit;

and how, as a result, the pending claims were unpatentable. *Id.* ¶ 30.

On July 25, 2013, the PTO examiner issued an initial rejection of the claims in the continuing

'260 Patent application, but, according to Xitronix, the examiner had still missed the significance

of the First Lawsuit. *Id.* ¶ 37.  In response to the initial rejection, Xitronix contends Stallman

repeatedly submitted arguments for patentability which directly contradicted the final judgment in

the First Lawsuit. *Id.* The '260 Patent ultimately issued August 26, 2014, and Xitronix alleges that

but for Stallman's fraudulent omissions and affirmative misrepresentations, the PTO would not have

issued the patent. *Id.* ¶¶ 35, 37.

Xitronix contends the '260 Patent has created artificial impediments to Xitronix's ability to

obtain the financing necessary to compete in the market and to the market's adoption of Xitronix's

technology. *Id.* ¶ 11. Through the '260 Patent, Xitronix alleges KLA has "obtained the illegitimate power to exclude its competitor Xitronix from the relevant market." *Id.* According to Xitronix, KLA has engaged in exclusionary conduct through its fraudulent procurement of the '260 Patent, and this conduct "was, and is, specifically intended to monopolize and destroy competition in the market for dopant activiation metrology, a market currently valued at approximately $650 million." *Id.* ¶ 12. Xitronix represents KLA's Therma-Probe 680 and Xitronix's XP700 system are the only two products in the market, and KLA has now obtained the power to exclude Xitronix from manufacturing or selling its product. *Id.* ¶ 13.

In response to these allegations, KLA has filed a motion to dismiss under Rule 12(b)(6), arguing (1) it has never "enforced" the '260 Patent for purposes of a *Walker Process* claim, and (2) it disclosed all relevant material to the PTO in prosecuting the '260 Patent, including this Court's final order and judgment from the First Lawsuit. The parties fully briefed the motion, which is now ripe for the Court's consideration.

## Analysis

### I.     Rule 12(b)(6)—Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In deciding a motion to dismiss under 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). However, a court is not bound to accept legal conclusions couched as factual

allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although a plaintiff's factual allegations need not establish the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. *Id.* Determining plausibility is a "context-specific task," that must be performed in light of a court's "judicial experience and common sense." *Id.* at 679. In deciding a motion to dismiss, courts may consider the complaint, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, such as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## II.     Application

### A.     *Walker Process* Antitrust Claim and the Requisite Level of Enforcement

#### 1.     Dispute Over Applicable Legal Standard

Xitronix has asserted only one claim in its complaint: a *Walker Process* antitrust claim, which finds its origin in the Supreme Court opinion *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965). In that case, the Supreme Court held:

> The enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are

present.  In such event the treble damage provisions of § 4 of the Clayton Act would
be available to an injured party.

*Id.* at 174.  Section 2 of the Sherman Antitrust Act provides that a "person who shall monopolize,

or attempt to monopolize, or combine with any other person, to monopolize any part of the trade or

commerce . . . shall be deemed guilty of a felony."  15 U.S.C. § 2.  Xitronix has asserted "attempted

monopolization" against KLA.  *See* Compl. [#1] ¶¶ 144–48.

KLA's first argument for dismissal centers on a *Walker Process* claim's requirement for

*enforcement* of the patent.  The parties agree KLA has not taken any affirmative action with respect

to the '260 Patent.  For instance, KLA has not sent Xitronix a cease-and-desist letter charging

Xitronix with infringement of the '260 Patent nor has KLA filed an infringement lawsuit against

Xitronix concerning the '260 Patent.  According to KLA, there must be an overt act of enforcement

before a plaintiff has standing to bring a *Walker Process* claim, and KLA cites cases holding mere

procurement of a patent, even if by fraud, cannot in itself violate antitrust laws.  *See* Mot. Dismiss

[#5] at 7 (citing cases).

The Court agrees with KLA that there is an "enforcement" element to a *Walker Process*

claim, and mere procurement of the patent by fraud is insufficient to state a claim for antitrust

violations.  KLA oversimplifies the matter, however, when it takes these two principles and leaps

to the assumption that "enforcement" must entail an overt act such as a cease-and-desist letter or an

infringement action.  Notably, KLA cites no case holding the "enforcement" requirement can only

be satisfied by an overt action.  The critical question then emerges: what level of "enforcement" is

required?  Unfortunately, what is meant by "enforcement" has rarely been an issue in the case law

because a *Walker Process* claim is typically asserted as a counterclaim to an infringement lawsuit.

*See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998) ("An antitrust claim premised on stripping a patentee of its immunity from the antitrust laws is typically raised as a counterclaim by a defendant in a patent infringement lawsuit."). In other words, the "enforcement" element is usually taken for granted.

The Federal Circuit, however, has addressed the "enforcement" requirement and made clear the inquiry does not turn on the existence of an overt act. In *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341 (Fed. Cir. 2004), the plaintiff sought a declaration that the defendant–competitor's patent was invalid and asserted an ancillary *Walker Process* claim. *Id.* at 1345. The defendant moved to dismiss the antitrust claim for lack of standing. *Id.* at 1347. In considering the meaning of "enforcement," the Federal Circuit compared the standard for standing under a *Walker Process* cause of action to the standard in a Declaratory Judgment Action. *Id.* at 1357–58. The court observed that "[s]trictly speaking, a *Walker Process* claim is premised upon 'the *enforcement* of a patent procured by fraud on the Patent Office.'" *Id.* (quoting *Walker Process*, 382 U.S. at 174). In comparison, "[a] plaintiff may bring a Declaratory Judgment Action of patent invalidity . . . even in the absence of overt enforcement actions." *Id.* at 1358. To the extent there was any tension between these two standards, the Federal Circuit clarified the law:

> We therefore hold that, as a matter of Federal Circuit antitrust law, the standards that we have developed for determining jurisdiction in a Declaratory Judgment Action of patent invalidity also define the minimum level of 'enforcement' necessary to expose the patentee to a *Walker Process* claim for attempted monopolization.

*Id.* This holding is critical to the issue presently before this Court, as it lies at the heart of the parties' dispute, and therefore bears repeating: for *Walker Process* claims, "enforcement" does not mean

active, overt enforcement and instead refers to whatever is necessary to establish jurisdiction in a Declaratory Judgment Action.

Having pegged the standard for *Walker Process* claim standing to the standard for Declaratory Judgment Actions, the next question becomes: what is the applicable standard for determining jurisdiction in a Declaratory Judgment Action? At the time of the *Unitherm* decision, the prevailing standard in the Federal Circuit was "a two-part test that first consider[ed] whether conduct by the patentee create[d] a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit, and second examine[d] whether conduct by the declaratory judgment plaintiff amount[ed] to infringing activity or demonstrate[d] concrete steps taken with the intent to conduct such activity." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1379 (Fed. Cir. 2007) (citing *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 721, 736 (Fed. Cir. 1988)). In 2007, however, the Supreme Court in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), rejected the "reasonable apprehension of suit" aspect of the two-part test, and instead held the proper test is whether "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 127; *see also SanDisk Corp.*, 480 F.3d at 1380 ("The Supreme Court's opinion in *MedImmune* represents a rejection of our reasonable apprehension of suit test.").

KLA suggests that since *Unitherm* was decided before *MedImmune* and since the Federal Circuit has not specifically adopted the standard for Declaratory Judgment Action standing announced in *MedImmune* in the *Walker Process* context, then *Unitherm*'s status as currently viable law is in doubt. *See* Reply [#9] at 3 n.3. The Court disagrees. First, *Unitherm* attached the *Walker Process* standard to the Declaratory Judgment standard as a general principle and not to the specific

standard for Declaratory Judgment that existed at the time.  KLA cites no reason, much less a case since *MedImmune*, indicating the courts should not continue matching the *Walker Process* standard to the Declaratory Judgment standard as held in *Unitherm*, even as the standard changes.

Second, KLA's argument is immaterial because neither the Declaratory Judgment standard in existence pre-*MedImmune* nor the standard established in *MedImmune* include overt enforcement of the patent as a requirement.  In *Unitherm*, the court described the then-prevailing "reasonable apprehension of suit" test for the specific purpose of explaining that overt enforcement actions are unnecessary to establish Declaratory Judgment jurisdiction.  *See Unitherm*, 375 F.3d at 1358 (citing *Arrowhead*, 846 F.2d at 736).[1]  The test announced in *MedImmune* is an even more relaxed standard which eliminated the "reasonable apprehension of suit" concept in favor of the more general idea of a "substantial controversy."  Either way, overt enforcement actions are not required as suggested by KLA's arguments.

In sum, Federal Circuit antitrust law equates the standards for determining jurisdiction in a Declaratory Judgment Action with those for defining the minimum level of "enforcement" necessary to state a *Walker Process* claim, and the standard for determining Declaratory Judgment jurisdiction is a flexible totality-of-the-circumstances approach focused on whether "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *MedImmune*, 549 U.S. at 127.

---

[1] In *Arrowhead*, the court made clear that "[w]hen the defendant's conduct, including its statements, falls short of an express charge [of infringement], one must consider the 'totality of the circumstances' in determining whether that conduct meets the first prong of the test."  *Arrowhead*, 846 F.2d at 736.  The court continued: "If the circumstances warrant, a reasonable apprehension may be found in the absence of *any* communication from defendant to plaintiff."  *Id.* (citation omitted) (emphasis in original).

2.      **Sufficiency of Xitronix's Pleadings**

With the legal standard in place, the Court turns its attention to Xitronix's allegations and considers whether they satisfy the "substantial controversy" standard for Declaratory Judgments. Xitronix's complaint is lengthy and details the history between the parties and how the issuance of the '260 Patent has, in its view, created a substantial controversy. *See* Compl. [#1] ¶¶ 15–143.  In its response, Xitronix summarizes the allegations it contends support a finding of standing [sic throughout]:

- The entirety of the six-plus year history of KLA's attempts to capture Xitronix's technology within its patents.  Compl.[#1] at 5, ¶¶ 19–20;

- KLA's historic threats against Xitronix, including its expression of its intent to enforce the '441 patent it obtained incorporating elements of Xitronix's technology *id*. at 5, ¶ 21;

- KLA's knowledge that, as long as it maintained artificial "intellectual property issues" surrounding Xitronix's technology, the market would not adopt Xitronix's technology, *id*.; and

- KLA's ongoing efforts, during the [First Lawsuit] and after, to do whatever it could to obtain patent claims covering Xitronix's technology, including pursuing the '260 patent claim that embedded this Court's claim construction from, and carried forward claims that had been litigated essentially verbatim in, the '441 litigation, *id*. at 6, ¶ 24; and

- The exclusionary consequences of KLA's procurement of the '260 patent on Xitronix's ability to enter the market, *id*. at 28–30, ¶¶ 120–25.

Resp. [#7] at 11–12 (footnote omitted).

Taking these specific citations and the complaint as a whole, the Court agrees with Xitronix that its allegations support a finding of a substantial controversy between these two parties with adverse legal interests as described in *MedImmune*.  In short, Xitronix alleges KLA purchased a company active in the semiconductor optical inspection market for $75 million.  When Xitronix

introduced a supposedly superior competing product with more advanced technology, KLA modified an already-existing patent application with the express purpose of capturing Xitronix's technology, and that application ultimately resulted in the '441 Patent. KLA actively asserted the '441 Patent against Xitronix, which caused Xitronix to file a declaratory judgment of non-infringement. A jury eventually found the asserted claims of the '441 Patent invalid on anticipation and obviousness grounds, and the Court additionally found the claims invalid for indefiniteness. Undeterred, KLA went back to the PTO and was able, through fraud, to obtain a new patent, the '260 Patent, which is essentially identical to the '441 Patent. While KLA has taken no action with respect to the '260 Patent, the effect of its existence—within the context of these two parties' history—is a variety of exclusionary consequences for Xitronix in the marketplace. The Court finds these allegations sufficient to survive Rule 12 scrutiny.

Additionally, the Court notes KLA has not actually disputed the sufficiency of Xitronix's allegations with respect to the "substantial controversy" standard from *MedImmune*. Instead, KLA has only argued the "enforcement" requirement necessarily means an overt act—an argument rejected by the Court. As such, KLA has not actually moved to dismiss on the ground Xitronix does not adequately plead a "substantial controversy."

### 3. Policy

By concluding Xitronix satisfies the "enforcement" requirement despite the fact KLA has apparently done nothing with the '260 Patent since its issuance, the Court wants to be clear it is not holding mere procurement of a patent can support a *Walker Process* claim. To the contrary, the Court agrees with KLA and the cases it cites that a patentee should not be subject to a *Walker Process* claim simply because it obtains a patent. What makes this case unique are Xitronix's

-12-

allegations, in addition to KLA's simple procurement of the '260 Patent, about the history of litigation between these parties and the connection between the '441 Patent and the '260 Patent. Here, taking Xitronix's allegations as true, KLA actively enforced the '441 Patent before it was ruled invalid through a final judgment in this Court. KLA, however, has since obtained the exact same patent, only now it has a different number. Faced with an antitrust claim, KLA seeks to have the claim dismissed because it has not technically taken any overt actions concerning the '260 Patent, even though it did take such action with the '441 Patent. The resulting conundrum is that KLA is actually best served by not actively asserting the patent at all. Put differently, KLA can benefit from merely owning an invalid patent while also remaining immune from any *Walker Process* antitrust claims as long as it never takes any action concerning the '260 Patent. In the Court's view, such an outcome undermines both patent and antitrust law.

Relatedly, the Court's decision does not pose a danger of broadening *Walker Process* claims beyond their intended scope. In *Unitherm*, the Federal Circuit made clear there are circumstances under which a plaintiff may assert a *Walker Process* claim despite the absence of any overt enforcement by the patent owner. This case presents the sort of unique allegations contemplated by the Federal Circuit's holding and is the sort of case that, in the Court's view, occurs infrequently. Moreover, declaratory judgment jurisdiction is discretionary with the courts, and each case requires careful analysis of the specific allegations present in the complaint. *See MedImmune*, 549 U.S. at 127 ("The Declaratory Judgment Act provides that a court *may* declare the rights and other legal relations of any interested party, not that it *must* do so.") (emphasis in original); *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) (nothing the federal courts have "unique and substantial discretion in deciding whether to declare the rights of the litigants"). The Court's decision is limited to the

circumstances of this case, and the Court rejects any notion its decision could open the floodgates

of *Walker Process* litigation or expose patentees to such claims simply based on their procurement

of a patent.[2]

## B.    Fraud on the PTO

KLA's second ground for dismissal is the failure to allege fraud. Specifically, KLA argues

that, according to Xitronix's own pleadings, KLA provided all of the relevant material, including the

Court's final order and judgment from the First Lawsuit, to the PTO, and therefore it complied with

its duty to disclose. In order to prevail on the fraud components of its antitrust claim, Xitronix must

show either that "the patentee 'obtained the patent by knowingly and willfully misrepresenting facts'

to the [PTO]" or that it made a fraudulent omission. *Nobelpharma*, 141 F.3d at 1068–71. Xitronix

presents both an affirmative misrepresentation theory and a fraud-by-omission theory.

---

[2] The Court notes the scholarship of Professor Christopher R. Leslie who has advocated for the abolishment of the "enforcement" requirement altogether. In a law review article directly on point to the issue before the Court, Professor Leslie has challenged the notion that mere procurement of a patent, no matter the conduct of the patentee in obtaining the patent, cannot—without more—affect the welfare of the consumer and in itself violate the antitrust laws. *See* Christopher R. Leslie, *The Anticompetitive Effects of Unenforced Invalid Patents*, 91 MINN. L. REV. 101 (2006). Instead, Professor Leslie contends "mere procurement and possession of an invalid patent can, in fact, injure competition and reduce consumer welfare." *Id.* at 113. Professor Leslie persuasively documents the variety of ways simple possession of an invalid patent can help maintain an illegitimate monopoly, including (1) how the "[t]he fear of infringement can deter entry into the monopolist's market, even if the potential competitor strongly believes that the patent at issue is invalid"; (2) the "increase[d] entry costs by compelling rivals to research the patent's validity, to attempt to design around the patent, or to pay (unnecessary) licensing fees"; (3) how "a monopolist's suspect patents can deter its competitor's customers, business partners, and venture capitalists from doing business with them"; and (4) how "firms may avoid entire fields of research out of fear of infringement litigation, a phenomenon that can distort innovation and reduce long term competition even further." *Id.* at 104, 114–39. Many of these factors are present in Xitronix's allegations, and Professor Leslie's research supports Xitronix's claims of antitrust injury despite the fact KLA has not overtly enforced the '260 Patent.

While Professor Leslie argued for elimination of the "enforcement" requirement in his article, which, notably, he wrote prior to *MedImmune* and the adoption of an even more adaptable standard for Declaratory Judgment jurisdiction, such a decision is beyond this Court's limited function. Interestingly, however, in subsequent papers, Professor Leslie has noted how *MedImmune* "has important implications for antitrust law" and that it has the potential to move courts away from rigid applications of the "enforcement" requirement. *See* Christopher R. Leslie, *New Possibilities for Asserting Walker Process Claims*, 21-SUM ANTITRUST 48, 50–51 (2007).

First, Xitronix argues KLA's patent attorney, Stallman, made affirmative misrepresentations regarding the status of relevant prior art. In the Court's post-trial final order in the First Lawsuit, it discussed the ample evidence that existed to support the jury's finding of invalidity of the '441 Patent based on anticipation and obviousness. *See* Order of Jan. 31, 2011 [#210] at 10–12, the First Lawsuit. In particular, the Court discussed to two specific examples of prior art, Batista and Mansanares, and the probe beam wavelength they taught, which was a range of 355 to 410 nanometers (nm):

> The inventors and the experts testified that it was known by persons of ordinary skill that overcoming noise problems would improve the commercial embodiment of the prior art Therma-Probe device, and this problem was overcome by increasing the strength of the output signal. Batista and Mansanares each individually taught that changing the probe beam wavelength from 670 to a particular wavelengths [sic] in the range of 355 to 410 would increase the output signal by a factor of ten. This was strong motivation for a person of ordinary skill to change the wavelengths [sic] of the prior art Therma-Probe device and method using the teachings of Batista or Mansanares. Thus, a reason existed at the time of the effective filing date of the '441 Patent that prompted a person of ordinary skill to change the wavelength of the probe beam in the prior art Therma-Probe device to a wavelength that increased the strength of the output signal, which reflects the obviousness of the claims.

*Id.* at 12 (citations to the trial record omitted).

Soon after entrance of the January 31, 2011 Order, KLA submitted the final order and final judgment to the PTO in February 2011. In 2013 and 2014, however, when a new patent examiner had taken over the ongoing '260 Patent application, Stallman made representations to the new examiner regarding the prior art, which Xitronix alleges contradict the actual state of the prior art and this Court's statements about the prior art. For example, Stallman claimed on March 12, 2014:

> [N]one of the prior art related to measuring modulated reflectivity on silicon semiconductor samples taught the claimed probe beam wavelength of 360 to 410 nm.

Compl. [#1] ¶ 72.

Similarly, in October 2013, Stallman represented:

> [T]he prior art fails to teach [the 360 to 410 nm] wavelength range for use in semiconductor samples when performing modulated optical reflectivity measurement.

*Id.* ¶ 73.

On April 17, 2014, the examiner allowed claim 1 of the '260 Patent, and Xitronix argues the examiner's stated rationale reflects his acceptance of KLA's fraudulent misrepresentations of the prior art:

> Regarding claim [1], the prior art of record fails to anticipate or render obvious a method for evaluating a silicon semiconductor sample comprising, among other essential features, focusing a fixed wavelength prove [sic] beam generated by a laser onto the sample within the region that has been excited, wherein the wavelength of the probe beam is between 360 and 410 nm; monitoring the changes in the power of the reflected beam induced by the pump beam; and generating output signals in response thereto, said output signals corresponding to the changes in the optical reflectivity of the sample the output signals containing information which is used to evaluate the sample, in combination with the rest of the limitations of claim [1].

*Id.* ¶ 78.

In the Court's view, these allegations are sufficient to satisfy the fraudulent misrepresentation element of a fraud-on-the-PTO claim. While Stallman was certainly free to present argument in favor of patentability, he was not free to misrepresent the state of the prior art as alleged by Xitronix. Moreover, the disclosure of all of the relevant prior art does not permit Stallman to make representations about that prior art that are false. Xitronix's allegations support a theory whereby Stallman told the PTO there was no prior art teaching a probe beam wavelength of 360 to 410 nm when he was fully aware of the Batista and Mansanares references that taught those wavelength ranges and this Court's final judgment that the '441 Patent was invalid as obvious due to those references.

Xitronix's second theory for fraud-on-the-PTO, which is related to its first, is that KLA had more than a duty merely to disclose all material information but also a duty to explicitly inform the examiner of the relationship between the pending claims of the '260 Patent and the invalid claims of the '441 Patent. When KLA failed to do so, Xitronix argues KLA fraudulently omitted material information.

"A patent applicant's duty to disclose material information to the PTO arises under the general duty of candor, good faith, and honesty embodied in 37 C.F.R. § 1.56(a) (1996)." *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997). Materiality embraces "any information that a reasonable examiner would substantially consider important in deciding whether to allow an application to issue as a patent." *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1382 (Fed. Cir. 1998) (quotation omitted).

As an example of KLA's alleged fraudulent omissions and its failure to uphold its duty of candor, good faith, and honesty, Xitronix points to the fact the Court held the '441 Patent invalid for indefiniteness because of its use of the term "substantially maximize" to describe the patented wavelengths at issue. *See* Order of Jan. 31, 2011 [#210] at 5–9, the First Lawsuit. During prosecution of the '260 Patent, the examiner recommended KLA incorporate the same "substantially maximize" language. Instead of pointing out to the examiner that the Court had held this same language indefinite, Stallman accepted the examiner's recommendation. According to Xitronix, this failure to inform the examiner of the contradiction between his suggestion and the final judgment of the First Lawsuit amounts to a breach of KLA's duty of candor, honesty, and good faith.

Again, the Court finds these allegations sufficient to state a claim for fraud. To remain silent and not inform the examiner that his suggested language had been previously ruled invalid for

indefiniteness in a final judgment states a claim that Stallman fraudulently omitted material information and did not comply with his duties of candor, honesty, and good faith.

### Conclusion

After careful review of the applicable legal standards and the allegations in the complaint, the Court concludes Xitronix has adequately pleaded "enforcement" for purposes of a *Walker Process* antitrust claim and fraud in procuring the '260 Patent.

Accordingly,

IT IS ORDERED that Defendant KLA-Tencor Corporation's Motion to Dismiss [#5] is DENIED.

SIGNED this the 24ᵗʰ day of June 2015.

Sam Sparks

SAM SPARKS
UNITED STATES DISTRICT JUDGE